## C. E. FOSTER v. L. ELMER THORNTON.

160 So. 490.
Opinion Filed December 6, 1934.
Supplemental Opinion Filed February 25, 1935.
Further Rehearing Denied April 5, 1935.

*Farris & Wilensky,* for Plaintiff in Error;

*Stockton, Ulmer & Murchison,* for Defendant in Error.

PER CURIAM.—In view of the nature of the evidence adduced and of the principles of law involved, a reargument of this case has been had on extraordinary petition for

rehearing filed by the plaintiff in error who was the defendant in the trial court.

The action is by the husband to recover damages for the death of plaintiff's wife, alleged to have been caused by negligence or unskillfulness of the defendant when he was treating her professionally as a chiropractor.

In three counts the declaration severally alleges:

(1) "That the defendant treated the deceased in an unskillful, careless and negligent manner whereby the deceased was fatally injured and caused pain and anguish and suffering of body and mind, and from which injuries the deceased languished and died";

(2) "That the defendant 'so carelessly and negligently treated the deceased and handled her so violently that the defendant ruptured a blood vessel in or leading to and supplying blood to the brain of the deceased, causing a hemorrhage from which the deceased, after severe and excruciating suffering, pain and anguish, died'";

(3) "That the treatment rendered by chiropractors consists in manipulating or adjusting the spinal column, so as to restore the vertebrae, which is considered to be out of alignment, to its proper place and to thus relieve the pressure on the nerves; that this is done by palpitating the spinus processes and forcing, pushing or manipulating the vertebrae into place; that the treatment consists entirely in manipulating the spinal column and attempting to adjust the vertebrae as above set forth; that the defendant undertook, for compensation, to treat and cure the deceased by manipulating her spinal column in the manner above set forth; that the defendant so carelessly and negligently rendered such treatment and negligently used so much force and violence in attempting to adjust the vertebrae of the deceased's spinal column that he ruptured a blood vessel at

or near the base of deceased's brain, causing a hemorrhage in or around her brain and spinal cord, from which the deceased, after severe and excruciating pain and anguish, died."

Trial was had on a plea of not guilty. Judgment was rendered for the plaintiff, and the defendant took writ of error.

The first opinion held that the evidence is quite sufficient to warrant a finding that the death of the plaintiff's wife resulted from the chiropractic adjustments made by the defendant; but that the evidence was not legally sufficient to prove that the adjustment to which the injury causing the death may be attributed, was done in an unskillful, careless or negligent manner. In the opinion on rehearing it was in effect held that the testimony of physicians and surgeons that the rupture of a blood vessel in the brain of the patient was caused by violence and the defendant's testimony that the adjustment to which he submitted the patient, if properly made, could not have caused the rupture, were legally sufficient to sustain a verdict for plaintiff.

The record has been again considered to determine finally whether the evidence is legally sufficient to support the verdict for the plaintiff, which includes a finding that the defendant negligently or unskillfully made chiropractic adjustments of the vertebrae in the spinal column of the plaintiff's wife, with such force and violence as to rupture a blood vessel causing a hemorrhage in or around the brain, resulting in death as alleged in the declaration.

Prior to the chiropractic treatment the patient was rather a healthy person except for periodic migraine headaches and high blood pressure. She had theretofore been rejected for life insurance.

The death certificate stated as causes of the death: "acute

hemorrhage pachymeningitis, thrombosis left lateral sinus, hemorrhage cervical spinal canal region, 1, 2, 3, cervical vertebrae."

Dr. Greene, a qualified physician, testified as an expert. His testimony included the following:

"Q. Could the rupture which you found in this brain have been caused by a sudden or forcible twisting of the neck, or by manipulation of or force to the vertebrae of the spinal column?

"A. Yes; twisting of the neck could cause it."

The chiropractors testified as experts that force used on the spinal column sufficient to rupture a vein in the brain would disarticulate the vertebrae and there was no such disarticulation, and that under the facts stated in the hypothetical questions the chiropractic adjustments made did not cause the traumatic rupture in the brain of the patient.

The physicians and pathologist testified as experts that force applied to the upper spinal column so as to cause a traumatic injury to the spinal cord might produce a rupture in a vein in the brain without sufficient force being used to disarticulate the vertebrae and that under the facts stated in the hypothetical questions the adjustments of the spinal column made did cause the rupture in a vein of the brain without causing a disarticulation to the vertebrae of the spinal column.

Such matters related not to proper chiropractic treatment but to an ulterior or untoward result of an unskillful or negligent application of force to the upper spinal column of the patient consequently the testimony of qualified physicians was as competent as that of qualified chiropractors.

There was a rupture in a vein of the brain which caused death. Force sufficient to cause the rupture is not proper treatment. Since it was a traumatic rupture causing injury

to the brain, the jury was warranted in finding from all the testimony adduced that an unskillful application of force in an adjustment of the upper spinal column caused the rupture in a vein of the brain.

The plaintiff testified without objection that the patient regained consciousness Sunday morning and that "she said she was sitting on the table in Doctor Foster's office; and he just twisted her neck, and it felt like something broke, it just felt like something went up through the back of her head to the top and flew off; everything turned black, and she became sick and started to vomit, and fainted."

The patient's family physician, who was not present when the chiropractic adjustments were made, testified without objection that when the patient regained consciousness at her house on Sunday morning after the treatment on Friday,

"I asked her what had happened." "She replied, she had been having an adjustment, I think is the term, an adjustment. She expressed it this way: 'I was having an adjustment, and had a sudden sharp pain in the back of my neck, extreme pain.' And from then on, she didn't remember what was going on." "She stated she was at Doctor Foster's office." "That during the manipulation of her neck, the receiving of the adjustment, she received a sudden sharp pain in the back, at the base of the skull, would be the most accurate way of expressing it. She said, the back of her head and neck."

The defendant testified:

"I placed my hand upon the spinus transverse and lamina of the second cervical vertebra, and, with a slight movement of the wrist, I gave an adjustment on that vertebra to correct that abnormal position or malalignment.

"Q. Were those exactly the same adjustments you had previously given her on the other four days preceding that

she had been to your office? A. Just exactly. Q. Any difference in them at all? A. None whatsoever.

"Q. I want you to state whether the chiropractic adjustments you gave to Mrs. Thornton, the wife, the deceased wife of the plaintiff in this case, on the fifth day she was at your office, as you have just stated and described to the jury, at the time and place stated, were properly and correctly made and given, and whether or not those adjustments were right and proper, and in accordance with the principles, rules and best method of the science of the chiropractic as practiced by legally qualified, confident and skillful chiropractors in this and similar localities under like or similar circumstances, having due regard for the advanced state of the science of chiropractic at the time stated. A. They were, yes.

"Q. You have heard the testimony with reference to Mrs. Thornton experiencing some pain, and groaning as though she were in pain. Just describe to the jury what transpired after the adjustment on the fifth day, which you say was the 22nd day of January.

"A. Yes, that is correct, on the 22nd day of January. After those adjustments, I left Mrs. Thornton lying on the table, stood by the table and chatted with her for several minutes, I don't know; eight or ten minutes, talking about her condition and things more or less in general. And about eight or ten minutes after the adjustment she grabbed her head and said she had a pain in the back of her head;

"Q. Did she indicate any pain or that she was suffering any pain during the time of the adjustments that you were making on this last day at your office, Doctor? A. None whatsoever, not until about ten minutes after the adjustment."

The autopsy showed evidence of hemorrhage in the upper

portion of the spinal column, with a thrombosis of the lateral sinus. And there was also hemorrhage in the veins, or a blood clot in the veins of the coverings of the brain, with an oozing hemorrhage into those coverings.

The evidence shows death was caused by hemorrhage from a rupture or tear in the small veins of the brain, and that there was no disease of the brain. Medical doctors testified that the brain was not diseased and that the rupture of the veins was caused by some kind of injury or violence or trauma, and that the rupture could have been caused by force in adjustments of the spinal column, while the chiropractors testified that a hemorrhage of the brain could have been the result of disease or other causes besides the injury by violence or trauma; but no other causes were shown to have been probable.

Dr. Heitz for the defendant testified that "if there was an injury to the cord, there would be an extravasation in the cord, causing an occlusion of the nerve impulse going to and from the brain."

Dr. Dyrenforth for the plaintiff testified: "The spinal cord was in a healthy condition, although there was evidence of extravasated blood about the coverings."

A standard of chiropractic treatment was not an essential to be shown in determining the issues in the case, since the injury alleged is ulterior and not a part of the treatment authorized. The declaration alleged that the treatment the defendant was engaged to administer "consists entirely in manipulating the spinal column and attempting to adjust the vertebrae," and that the defendant "negligently used so much force and violence in attempting to adjust the vertebrae of the deceased's spinal column that he ruptured a blood vessel at or near the base of deceased's brain causing a hemorrhage in and around her brain and spinal cord,

from which the deceased, after severe and excruciating pain and anguish, died." The injury alleged is not the result of administering a standardized chiropractic treatment; but an ulterior injury alleged to have been caused by negligence in using violence or force.

The defendant testified that the adjustment treatment he gave the patient was according to approved standards of chiropractic adjustments and that he exercised proper care. This was supported by other chiropractors who testified as experts. Defendant doubtless was unaware of any unskillful, negligent or undue force or untoward act or omission, though the evidence justified an inference of an untoward act of force in making the delicate adjustments.

An inference of undue force or unskillful manipulation by the defendant in making the adjustments may legally and fairly be drawn from the nature of the injury to the brain as testified to by the medical doctors, and such inference may sustain the verdict notwithstanding the testimony of the chiropractors as experts that the propriety and nature of the adjustments made as stated in hypothetical questions were proper according to approved standards of chiropractic treatment. This is so because the medical doctors are as competent to testify as to the effect of physical force or injury applied to the human organism as are chiropractors and the whole evidence was legally sufficient to justify an inference of undue force or unskillfulness in making the adjustments in the upper vertebrae at the time the patient suddenly complained of severe pain in the back of her head and neck from which she never recovered.

The experts differed as to the amount of force or violence used in making adjustments of the spinal vertebrae that would likely produce the traumatic injury to the brain as alleged; but the injury was shown by competent legal

evidence, and the testimony warranted a finding that it was a traumatic injury to the brain that was not diseased, and that it was an ulterior injury caused by negligent or unskillful adjustments of the patient's spinal column.

If an injury to the patient is alleged to have been caused by the negligence, carelessness or unskillfulness of the professional man with reference to the professional treatment undertaken by him, a justiciable issue thereon should be determined upon due consideration of the expert testimony of those who qualify as being skilled in and conversant with the defendant's school of scientific professional treatment. But where it is alleged that in administering the treatment an ulterior or untoward injury was negligently, carelessly or unskillfully done by the defendant to a part of the patient's person not properly involved in the assumed treatment, and where as in this case it requires expert scientific anatomical or other knowledge and experience to discover such untoward injury and its cause, the justiciable issue as to whether the defendant caused the untoward injury by negligent, careless or unskillful conduct in administering the professional treatment undertaken by him, may be determined upon due consideration of the legal testimony of duly qualified experts in the premises, without special reference to any school of scientific learning and practice having reference to the human organism and its ailments and cures.

The legal sufficiency of oral evidence to sustain the verdict of a jury where the testimony is conflicting is not determined by the mere number of witnesses, but by the probative force that the jury could legally have given to the evidence that supports the verdict when all the evidence adduced is duly considered.

Where a verdict in a civil action is rendered on conflict-

ing testimony under appropriate and fair charges, and judgment is rendered thereon, after the denial of a motion for new trial which contains a ground challenging the sufficiency of the evidence to sustain the verdict, and no material error of law or procedure affecting the verdict is made to appear, the appellate court will not reverse the judgment on the ground that the evidence is not sufficient to sustain the verdict when there is substantial unimpeached legal evidence which fairly tends to support the verdict and the verdict is not against the manifest weight of the evidence, and on the whole record it does not appear that the verdict is clearly wrong or that it was influenced by something outside of the evidence as adduced in the case. Wilson v. Maddox, 97 Fla. 489, 121 So. 805; Jennings v. Pope, 101 Fla. 1476, 136 So. 471; Clerk v. United Grocery Co., 69 Fla. 624, 68 So. 766; F. E .C. Ry. v. Hayes, 66 Fla. 589, 84 So. 274; So. Express Co. v. Williamson, 66 Fla. 286, 63 So. 433; Jacksonville Electric Co. v. Cubbage, 58 Fla. 287, 51 So. 139; McSwain v. Howell, 29 Fla. 248, 10 So. 588; Mayo v. Hynote, 16 Fla. 673; Forcheiner & Co. v. Mayo, 16 Fla. 676; DeFuniak Springs v. Purdue, 69 Fla. 326, 68 So. 235; Palatka Abstract & Title Co. v. Haskell, 100 Fla. 1504, 131 So. 394; S. A. L. Ry. v. Scarborough, 52 Fla. 425, 42 So. 706; Key v. Moore, 78 Fla. 205, 82 So. 810; 308 East 79th St. Corp. v. Favorite, 111 Fla. 234, 149 So. 625; Merchants Transportation Co. v. Daniel, 109 Fla. 496, 149 So. 401.

The testimony shows that the blood vessels of the patient's brain were not diseased, and that the rupture was caused by the use of force or violence. There was a traumatic hemorrhage. If high blood pressure or other ailment of the patient made the blood vessels subject to a traumatic rupture by slighter force or violence than they otherwise would have been, that would not relieve the defendant from

liability for the injurious consequences of any negligent or unskillful use of force or violence in making the chiropractic adjustments. 48 C. J. 1122.

There are assignments of error on the giving and refusal of charges and exceptions to testimony predicated upon the theory that an allegation of malpractice by a chiropractor must be proven by the expert testimony of qualified chiropractors.

In this case the allegation is not that the defendant was negligent or unskillful in his treatment for the patient's ailment, but that in administering the treatment by chiropractic adjustments of the vertebrae of the patient's spinal column, the defendant negligently or unskillfully used such force or violence as to cause an ulterior traumatic rupture of a blood vessel in the patient's brain resulting in her death. The ulterior injury alleged being to the brain and not visible externally, it could not be shown by the testimony of non-experts; but such injury being to the human brain, it could be shown by expert testimony of physicians, pathologists or surgeons who qualify as having expert knowledge of such human organisms and injuries thereto. The injury alleged is not a part of or a consequence of authorized chiropractic treatment to be testified to only by chiropractors. It is an ulterior injury that may be shown by qualified experts having knowledge and experience as to such injuries. No harmful error in giving or refusing charges is made to appear.

The foregoing expression of opinion is concurred in by Mr. Chief Justice DAVIS, Mr. Justice WHITFIELD and Mr. Justice BROWN and represents the view entertained by them respecting the decision of this case, which view is to the effect that no legal error has been shown as cause for re-

versal of the judgment of the Circuit Court and therefore the judgment appealed from should stand affirmed.

Mr. Justice ELLIS, Mr. Justice TERRELL and Mr. Justice BUFORD are of the opinion that the judgment should be reversed for a new trial.

Under ordinary circumstances an equal division of the Supreme Court on the question whether or not a judgment appealed from should be affirmed, would impose upon those members of the Court voting for reversal the duty to affirm the judgment in order that an end might be put to the litigation where there is no prospect of any immediate change in the personnel of the appellate court. See State, *ex rel.* Hampton, v. McClung, 47 Fla. 224, 37 Sou. Rep. 51. But in the present case, the judgment of the Circuit Court was, pursuant to an opinion adopted and filed by a majority of this Court on August 10, 1933, first reversed for a new trial, after which a petition for rehearing was filed and granted and a rehearing and reargument had before the whole court. On said second consideration of this case on rehearing, the conclusion was reached in an opinion adopted and filed in this cause of February 9, 1934, by a majority of the court, that the Supreme Court should recede from its former conclusion of reversal and should affirm the judgment, which was done.

The present consideration of this case by this Court for a third time is pursuant to a special order made by the Court granting plaintiff in error's special petition to recall the mandate on the judgment of affirmance and grant to plaintiff in error a rehearing on the Court's judgment of affirmance entered February 9, 1934, which had receded from the Court's judgment of reversal entered August 10, 1933. The rehearing as to the judgment of reversal of August 10, 1933, was granted on the application and petition of de-

fendant in error, while the present consideration is predicated upon an extraordinary petition for a second rehearing that has been specially permitted to be filed on behalf of the plaintiff in error in view of the Court's having receded from its original judgment of reversal that was in plaintiff in error's favor.

In view of the peculiar situation created by the circumstance that the Supreme Court now stands equally divided as to the judgment to be rendered concerning plaintiff in error's petition for a rehearing as to the judgment of affirmance last entered by the Court which was itself a judgment receding from a prior judgment of reversal that this Court had entered on August 10, 1933, it seems to the Court that, notwithstanding the equal division of the Court on the merits of the appeal, and notwithstanding the individual opinions entertained by the several justices respecting the judgment that ought now to be rendered on this second application for a rehearing in this cause, that the ends of justice will be best subserved by granting the extraordinary petition for rehearing filed by plaintiff in error, reinstating the first judgment of this Court, which was a judgment of reversal of the judgment of the Circuit Court, and thereupon remanding the cause to the Circuit Court without direction other than to grant a new trial and have the issues resubmitted for reconsideration by another jury in due course of procedure at another trial to be had of this cause.

It is therefore considered and adjudged by this Court that the judgment of affirmance entered by this Court on February 9, 1934, be vacated and recalled, and that the judgment of reversal entered by this Court on August 10, 1933, be reinstated and made the judgment of this Court on the pending writ of error, and that thereupon this cause be remanded to the Circuit Court of Duval County without di-

rection other than to grant the defendant's motion for a new trial and resubmit the issues in the cause for reconsideration and redetermination by another jury at a trial to be held pursuant to law and the course of legal procedure, each party to this writ of error to pay his own costs incident to the appeal. Let a mandate be issued accordingly.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.

## SUPPLEMENTAL OPINION.

ELLIS, P. J.—This case has probably produced in the minds of the individual members of this Court less degree of satisfaction in the composite judgment of the Court as expressed in any of the three conclusions reached than any case which it has been the duty of the Court to consider in many years.

That state of mental perturbation doubtless arises primarily from the inadequate knowledge which until the present time exists concerning human life and its dependence upon the orderly functioning of the great number of organs, nerves, bloodvessels, tissues and cells of the human body and their relation to one another, and the failure of the evidence in the case to reveal with sufficient clearness to a moral certainty the dependent relation of a tiny blood vessel in the upper frontal covering of the brain to the particular vertebral integer of the spinal column structure, which was involved in the "adjustment" attempted by the defendant practitioner to be made and which formed the basis of the action against him.

The cause of action as alleged in the declaration was stated by Mr. Justice BUFORD, in the opinion rendered on the 10th day of August, 1933. As stated in that opinion, Doctor Foster, as a doctor of chiropractic surgery undertook to attend, treat and care for Mrs. Thornton, who was suffering from certain disorders.

The declaration alleged that his treatment of the patient was unskillful, careless and negligent, whereby she was fatally injured and was caused to suffer pain of body and mind from which injuries she languished and died.

There were three counts to the declaration. The second alleged that the doctor carelessly and negligently treated the patient and handled her so violently that he "ruptured a blood vessel in or leading to and supplying blood to the brain of the deceased, causing a hemorrhage from which the deceased, after severe and excruciating suffering, pain and anguish, died."

The third count alleged that: "the theory of chiropractors is that most, if not all, diseases come from pressure on the nerves caused by vertebrae deviating from the normal; that the chiropractor does not believe in the germ theory of diseases; that the treatment rendered by chiropractors consists in manipulating or adjusting the spinal column, so as to restore the vertebrae, which is considered to be out of alignment, to its proper place and to thus relieve the pressure on the nerves; that this is done by palpitating the spinous processes and forcing, pushing or manipulating the vertebrae into place; that the treatment consists entirely in manipulating the spinal column and attempting to adjust the vertebrae as above set forth." It is then alleged that Doctor Foster "so carelessly and negligently rendered such treatment and negligently used so much force and violence in attempting to adjust the vertebrae of the deceased's spinal column that he ruptured a blood vessel at or near the base of deceased's brain, causing a hemorrhage in or around her brain and spinal cord, from which the deceased, after severe and excruciating pain and anguish, died."

The essential allegations of the three counts here set out in full in the third opinion prepared and filed by this Court

on December 6, 1934, to which the last petition for a rehearing submitted by the plaintiff in the trial court was addressed. As pointed out in that opinion, the trial was upon the plea of not guilty.

Mr. Justice BUFORD, in the first opinion, stated that the "science of chiropractic treatments is recognized as embracing a proper method for the treatment of many human ills and ailments." That treatment by such method for the cure of ills from which human beings suffer is recognized by the laws of the State and those who practice according to such science are required by law to obtain certificates and license to do so just as physicians of other schools of clinical surgery are required to do.

A verdict for the plaintiff was rendered on the trial of the case and judgment was duly entered.

The court in the first opinion, speaking through Mr. Justice BUFORD said: if a "patient dies while undergoing an operation by a surgeon, although the operation may be the immediate cause of death, is not of itself sufficient to prove that the surgeon was performing the operation in a careless, negligent or unskillful manner." In other words, the doctrine of *res ipsa loquitur* does not apply.

The doctrine thus announced in the first opinion was affirmed by the second opinion of this Court prepared and entered on February 9, 1934.

In the first opinion the view of the evidence was expressed that "Because of the lack of proof adduced from witnesses who could qualify as experts as to the proper and correct method of administering the adjustments involved in this case and that such adjustment was administered in a careless, negligent or unskillful manner, the judgment should be reversed."

On a petition for a rehearing granted on the applica-

tion of Mr. Thornton, this Court, speaking through the writer of this opinion, expressed the view that "when circumstantial evidence is relied upon in a case like the one at bar to establish negligence on the part of a physician or surgeon in the administration of treatment to a patient whom the physician or surgeon has decided should be subjected to the particular treatment administered the circumstances should raise a fair presumption of negligence. * * * For the circumstances therefore to have any probative value as evidence of the principal question they must of necessity be not only consistent with the theory that the result inquired into flowed therefrom but inconsistent with any other result which might just as reasonably and logically be established by such circumstances."

In that decision the Court receded from its former conclusion and decided that the judgment should be affirmed. Now in that opinion we said that the jury had decided that Mrs. Thornton's death was caused by a ruptured blood vessel in the brain; that physicians and surgeons had testified that the rupture was caused by violence and the defendant, Mr. Foster, testified that the " 'adjustment' to which he submitted the patient, if properly made, could not have caused the rupture." We said that the cause of the rupture was evidenced by the fact that the "patient went to the doctor's rooms for a treatment like that which she had before received and while under the treatment suddenly suffered the shock which resulted in severe pain and subsequent unconsciouness."

The effect of the holding in the second opinion was that there was evidence that the rupture of the blood vessel was caused by violence and that violence occurred in the adjustment made or attempted to be made by Doctor Foster who said that the " 'adjustment' to which he submitted the

patient, if properly made, could not have caused the rupture."

Now the point about which the Court is concerned after a third examination of the evidence is that the argument from the facts by which the jury arrived at its conclusion possesses no apparent cogency. In different words, the conclusion has no seeming connection with the premises. Any adjustment of a displaced vertebra is necessarily produced by violence in the broad sense of the exertion of any physical force considered with reference to its effect on another than the agent. See Webster's International Dictionary, 2nd Ed.

Where one or more vertebrae of the spinal column is, or are, out of alignment, deviating from the normal, the chiropractic science supports the theory that the vertebrae so out of alignment must by physical force exerted upon the affected region be pushed back into position, which as the third count of the declaration alleges is accomplished by "palpitating the spinous processes and forcing, pushing or manipulating the vertebrae into place.", If properly made no rupture occurs, as the defendant said, but it does not follow that if the adjustment is improperly made that a rupture of a blood vessel in the brain results, nor does it follow that an adjustment improperly made necessarily implies an excessive use of physical force to the point of carelessness.

The third opinion, prepared by Mr. Justice WHITFIELD and filed December 6, 1934, contains a careful analysis of the evidence relating to the pathological condition from which Mrs. Thornton suffered for many years prior to the chiropractic treatment she received on January 22, 1932, and for two weeks following that treatment to the time of her death. That able discussion of the evidence, however,

fails seemingly to have convinced all the members of the Court that the existence of the venal thrombus was the result either of a pachymeningitic condition of the dura mater, or a traumatic injury to the spinal cord, if such an injury could indeed produce the hemorrhage at the point on the side of the brain where the tear occurred according to Doctor Green. That eminent specialist said that the "rupture of a brain membrane and the incident tearing of the veins that followed and was caused by the twisting of a neck is a matter of increased pressure within the skull." He also said that twisting of the neck could have caused the venous hemorrhage discovered by him.

But it seems not to follow that if the twisting of the patient's neck constituted part of the process of "adjustment treatment" which was administered to her that such twisting of the neck constituted of itself a negligent, careless or unskillful act.

In a case involving such thorough knowledge of the human regional and pathological anatomy the technical rules of law by which the sufficiency of evidence as to ordinary or usual transactions between man and man is determined seem to be inadequate to enable one enquiring into the cause of a pathological condition of a person suffering pain to arrive at a conviction to moral certainty as to cause.

The Court therefore decided unanimously that the ends of justice will be best subserved by reinstating the first judgment of this Court which was a judgment of reversal and therefore remanded the cause to the Circuit Court for a new trial and have the issues resubmitted for reconsideration by another jury.

The effect of that judgment is that the trial court should have granted the motion for a new trial. The statute requires the Supreme Court on an appeal or writ of error to

examine the record and to reverse or affirm the judgment or decree of the court below or to give such judgment, sentence or decree as the court below ought to have given or as it may appear according to law. Section 4637, C. G. L. 1927.

It has been the practice in this State in Chancery cases that where the testimony submitted to a Chancellor is not sufficient on some point to authorize a just decree in the cause and it clearly appears from the record that testimony does exist on such point sufficient to enable the court to make a just decree the cause will be remanded with directions to take further testimony on such point. See Morgan v. Dunwoody, 66 Fla. 522, 63 South. Rep. 905.

By parity of reasoning where in a case at law it appears that evidence is obtainable upon a highly technical point of physiology such as was involved in this case and the evidence submitted is not sufficient in its nature and character to produce a conviction to a moral certainty of the allegations of the declaration affecting the alleged cause of the injury and the ends of justice would be best subserved by a resubmission of the case to the jury, the rule followed in Chancery proceedings would be applicable.

There were one hundred and twenty-one assignments of error filed under the rule in the Circuit Court for Duval County which the plaintiff in error stated that he intended to present by the bill of exceptions as grounds for reversal of the judgment.

In the brief prepared in behalf of the plaintiff in error ten questions are stated to be involved. Eight of them relate to the character of evidence relied upon to recover damages in the case; one relates to the right of a husband to recover funeral expenses in an action for the wrongful death of his wife, and the other to the sufficiency of the

evidence to show the life expectancy of the plaintiff's wife. So the scope of the injury as to the merits of the case was limited by the brief largely to a question of the sufficiency of the evidence to support the verdict.

On that question the members of the Court were equally divided upon the last consideration of the case on rehearing in so far as it may be said that the evidence submitted in the case answers the technical requirements of the rule under which the Court will not disturb a verdict if there appears to be substantial evidence to support it, but we reviewed the entire record including the charges of the Court, the admission of hypothetical questions, and the effect of the evidence of a certain expert witness who said a very slight force, however gently and scientifically applied, might result in the injury to the brain from which it is alleged that Mrs. Thornton died, and we concluded that the inspection of the entire record led the Court to the conviction that justice would best be subserved by ordering a. new trial of the case.

WHITFIELD, C. J., and BROWN, BUFORD, and DAVIS, J. J., concur.

### ON PETITION FOR FURTHER REHEARING.

PER CURIAM.—A further petition for further rehearing having been filed herein subsequent to this Court's opinion of February 25, 1935, it is thereupon considered, ordered and adjudged that the said extraordinary petition for further rehearing be denied.

The simple meaning of the last stated judgment of this Court on reversing this cause for a new trial under the particular circumstances, is that this Court, in view of the differences of opinion of the Justices now entertained on the basis of what appears in the present record after the

judgment was once heretofore affirmed on said record, warrant and require an award of a new trial in the cause in the interest of justice and in order that upon any subsequent review of this litigation by this Court, this Court may then have the benefit of any further light that either of the parties may be able to throw on the present controversy, in the event the case should again come before this Court after another trial resulting in judgment for either party.

Further rehearing denied and mandate directed to issue forthwith.

WHITFIELD, C. J., and ELLIS, TERRELL, BUFORD, and DAVIS, J. J., concur.